# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

---

INDUSTRIAL TECHNOLOGY VENTURES LP,

Plaintiff,

-vs-

PLEASANT T. ROWLAND REVOCABLE TRUST,
W. JEROME FRAUTSCHI LIVING TRUST, W.
JEROME FRAUTSCHI, and DIANE C. CREEL,

Defendants.

DECISION and ORDER
08-CV-6227-CJS

---

## APPEARANCES

| | |
|---|---|
| For Plaintiff Industrial Technology Ventures, L.P. | Gregory P. Gulia, Esq.<br>Duane Morris LLP<br>1540 Broadway<br>New York, NY 10036-4086<br>(212) 692-1027 |
| For Defendants Pleasant T. Rowland Revocable Trust, W. Jerome Frautschi Living Trust, W. Jerome Frautschi | Kevin M. Kearney, Esq.<br>Hodgson Russ LLP<br>The Guaranty Building, Suite 100<br>140 Pearl Street<br>Buffalo, NY 14202-4040<br>(716) 848-1385 |
| For Defendant Diane C. Creel | Elizabeth J. Reilly-Hodes, Esq.<br>M. Duncan Grant, Esq.<br>Patricia A. McCausland, Esq.<br>Pepper Hamilton LLP<br>3000 Two Logan Square<br>Eighteen and Arch Streets<br>Philadelphia, PA 19103<br>(212) 981-4343 |

Michael R. Wolford, Esq.
Sarah Snyder Merkel, Esq.
The Wolford Law Firm LLP
16 East Main Street
600 Reynolds Arcade Building
Rochester, NY 14614
(585) 325-8008

## INTRODUCTION

This diversity lawsuit alleging unjust enrichment, tortious interference with business relationships, common law fraud, civil conspiracy and violations of the Securities Exchange Act of 1934 is before the Court on motions to dismiss filed by Pleasant T. Rowland Revocable Trust, W. Jerome Frautschi Living Trust (collectively the "Trusts") (Docket No. 5), W. Jerome Frautschi ("Frautschi") (Docket No. 7) and Diane C. Creel ("Creel") (Docket No. 10). For the reasons stated below, the motions are granted in part and denied in part.

## BACKGROUND

The Court accepts the factual allegations in the first amended complaint (Docket No. 4) as true for the purpose of considering the motions to dismiss. In general, Plaintiff, Industrial Technology Ventures, L.P. ("ITV"), a Georgia limited partnership, alleges that

> [t]his action arises out of an unlawful scheme among the Defendants to take advantage and control of the Company when the Company was in need of capital. The Defendants acted at the expense of the Company's shareholders, including ITV, whose investments in the Company were severely diluted as a result of the Defendants' unlawful conduct. The Defendants also fraudulently induced ITV, and other shareholders, to sell a substantial number of shares in the Company for an unreasonably low price in light of material facts known to Defendants at the time of the sale, but intentionally withheld from ITV, and other shareholders.

(First Am. Compl. ¶ 3.) The Trusts are both citizens of Wisconsin, as is Frautschi. Creel is a citizen of New York, with an address in Rochester. ITV alleges that Defendants committed tortious acts inside and outside of New York and that such acts had an effect in New York. (First Am. Compl. ¶¶ 10 & 11.)

ITV invested in AnAeorobics, Inc. ("AnAerobics" or "the Company"), a company later known as Ecovation, Inc.[1] Prior to September 2002, AnAerobics had maintained a four million dollar line of credit with U.S. Bank, which was facilitated and guaranteed by the Trusts. In September 2002, AnAerobics issued Series A Preferred Stock, which ITV purchased pursuant to a Stock Purchase Agreement, a Voting Agreement and an Investor Rights Agreement, all of which are attached to the first amended complaint. ITV made four investments in AnAerobics by purchasing a total of 17.8% of the Series A Preferred stock as of March 2004. ITV purchased 4,681,422 shares of stock at $0.95 per share for a total investment of $4,447,351.57. Under the Voting Agreement, ITV designated Edward Wilson ("Wilson") to the AnAerobics's board of directors. ITV encouraged other institutions to invest in AnAerobics as well. Sterling Venture Partners, L.P., invested, and designated Eric Becker ("Becker") to the board.

The Trusts[2] also bought Series A Preferred stock and designated Frautschi to represent them on the board. Defendant Creel became chief executive officer ("CEO") of AnAerobics on May 19, 2003.

---

[1]Hoover's Company Records, Ecovation, Inc. (Jan. 27, 2009).

[2]The first amended complaint refers to the Trusts as the Lenders, and in its memorandum of law in opposition to Creel's motion to dismiss, ITV clarifies that the Lenders were actually the Guarantors, since they never actually lent money to AnAerobics, but, instead, provided lines of credit to the corporation. The Court will refer to them as the Trusts in this decision and order.

In June 2004, AnAerobics wanted to raise additional capital to fund its growth and the board of directors agreed to increase AnAerobics' line of credit to $30 million. AnAerobics entered into a Line of Credit agreement with the Trusts in which the Trusts would be provided with warrants to purchase 2,355,438 shares of AnAerobics Common Stock at a price of $0.50 per share. The Line of Credit agreement also included a provision that was carried over from the prior four million dollar line of credit—it required AnAerobics to maintain a minimum net worth in order to avoid default.

By 2005, AnAerobic had quickly expanded and was experiencing cash flow problems. It was also in default under the minimum net worth provision of the line of credit. Accordingly, the board of directors realized the need to raise additional capital. The Trusts offered to temporarily waive the minimum net worth provision until the end of 2005 in exchange for receiving 500,000 shares of Common Stock with a nominal price of $0.01 per share. The board accepted the offer, and encouraged CEO Creel to actively investigate available options for obtaining additional capital. In late 2005, Creel reported to the board on her discussions with other companies that had expressed an interest in purchasing AnAerobics, however, her discussions did not result in a completed sale. Consequently, the board authorized Creel to negotiate with the Trusts for an additional extension of the waiver of the minimum net worth provision. During these discussions, Frautschi left the room, since his position with the Trusts put him in conflict with AnAerobics.

ITV alleges that pursuant to his scheme with Creel, Frautschi resigned from the board of directors in November 2005. According to ITV, Creel, who wanted a more lucrative compensation package from AnAerobics, then worked with Frautschi to manipulate AnAerobics's need for an extension of the waiver. She did so by convincing the

board to accept an extension of the waiver "under extremely unfavorable terms to other shareholders, including ITV." (First Am. Compl. ¶ 36.) In return, ITV alleges that Creel was promised more compensation once the Trusts controlled AnAerobics. Creel agreed with Frautschi to demand that the board release Frautschi from all liability associated with his duties on the board in exchange for an extension of the waiver.

On January 25, 2006, Creel presented the terms she had negotiated with Frautschi and recommended that the board release Frautschi from liability in exchange for a further extension of the waiver. The board requested that Creel attempt to negotiate better terms "and to thoroughly analyze all the potential repercussions of releasing Frautschi from liability as a Board member." (First Am. Compl. ¶ 40.)

On February 10, 2006, Creel reported to the board that the Trusts' demands were unwavering—that the Trusts would extend the waiver to June 30, 2006, only if the board released Frautschi from liability. Further, the Trusts wanted AnAerobics to cancel the common stock warrants the Trusts held, and replace them with warrants to purchase Series A Preferred stock at a price of $0.50 per share. Because Creel was, according to ITV, scheming with the Trusts and Frautschi, she recommended that the board accept the terms, ignoring other sources of capital that were available to AnAerobics on more favorable terms. Relying on Creel's recommendation, the board accepted the terms. In the Spring of 2006, "Creel's demands for a more lucrative compensation package from the Company became more frequent." (First Am. Compl. ¶ 45.)

In April 2006, Creel informed the board that the thirty million dollar line of credit would be insufficient to support AnAerobics' planned growth, and that AnAerobics was still in violation of the minimum net worth requirement, the waiver of which was due to expire

on June 30, 2006. The board hired JP Morgan to identify a summary of prospective buyers for AnAerobics. Among those identified by JP Morgan was Ecolab, which subsequently did not express any interest in purchasing AnAerobics.

In a June 1, 2006, board meeting, Creel told the board that AnAerobics needed an additional ten to twelve million dollars to continue operations through the end of the year and avoid default under the minimum net worth requirement of the line of credit. Creel asked ITV and the other Institutional Investors[3] to submit a term sheet describing their proposed funding, and that she would show the term sheet to the Trusts and report to the board on the financing before the expiration of the waiver. The Institutional Investors submitted a term sheet on June 14, 2006, that provided enough capital to raise AnAerobic's net worth above the minimum net worth requirement in the line of credit, and allowed for pro rata share participation by all the investors in AnAerobics, including the Trusts, "and was consistent with the Right of First Refusal provision of the Investor Rights Agreement." (First Am. Compl. ¶ 51.) Creel delayed taking action on the term sheet and never entered into arms-length discussions with the Trusts about it. Instead, Creel waited until days before the wavier expiration and met with the board to explain that the Trusts would not accept the term sheet terms, and presented the board with a "take it or leave it" term sheet from the Trusts. The Trusts' terms would increase the line of credit to about fifty million dollars, would require AnAerobics to issue warrants allowing the Trusts to purchase an additional 12,204,474 shares of Series A Preferred stock at $0.01 per share (a value in excess of $26 million), and would change the exercise price on the prior warrant for

---

[3]"ITV was also instrumental in encouraging other investors to fund AnAerobics, including Sterling Venture Partners, LP ('Sterling') and Cargill, Inc. ('Cargill'). ITV, Sterling and Cargill were collectively known as the 'Institutional Investors.'" (First Am. Compl. ¶ 18.)

Class A shares from $0.50 to $0.01 per share. ITV's analysis of the Trusts' terms were that,

> [o]nly the Lenders were permitted to participate in this financing even though the Institutional Investors were eager to be involved. By couching the financing in debt rather than equity, the Lenders sought to circumvent the anti-dilution provisions in the Amended Certificate and the Right of First Refusal provision in the Investor Rights Agreement by denying the Institutional Investors their right to purchase their pro rata share of the stock issued in connection with this financing.

(First Am. Compl. ¶ 57.) In addition, the Trusts wanted to expand the board of directors to eleven members, with the additional four members to be designated by the Trusts. Finally, the Trusts insisted that Creel's compensation be left to the sole discretion of the Trusts. Faced with the threat of foreclosure upon the expiration of the minimum net worth provision, on June 24, 2006, the board voted unanimously to accept the Trusts' conditions.

The Trusts now held a controlling interest in AnAerobics, despite not having to invest any additional cash in AnAerobics. Their Series A stock ownership rose from 23.7% in 2002 to over 50% in June 2006. "Through the First Series A Warrants, the Series A Conversion and the Second Series A Warrants, the Lenders had obtained a priority liquidation preference in excess of $30 million. The Lenders would eventually receive in excess of $40 million upon the sale of the Company in exchange for these shares alone." (First Am. Compl. ¶ 62.)

Creel threatened to leave AnAerobics if her compensation was not increased. Since the Trusts' loan was not finalized until July 2006, her threats were made to the compensation committee of the board of directors, which included two directors designated by the Institutional Investors. Creel also told the compensation committee that if she left AnAerobics, the Trusts would withdraw their financing under the terms they presented to

the board. Becker, one of the members of the compensation committee, vehemently opposed Creel's demands for increased compensation, and went to the Trusts to discuss Creel's demand. The Trusts told Becker to give Creel the compensation package she wanted, and the board, concerned about foreclosure of AnAerobics, agreed to Creel's demands. Wilson resigned from the compensation committee in July, and Creel worked with the Trusts to remove Becker from the compensation committee and the board of directors on October 24, 2006.

In mid-January 2007, Dan Hagen ("Hagen"), an AnAerobics representative, attended an industry conference and was approached by an Ecolab representative who expressed "a vigorous interest" in purchasing AnAerobics. Hagen contacted AnAerobics' former chief financial officer, and that individual instructed Hagen to tell Creel about the contact with Ecolab. Hagen did so, but ITV alleges that Creel, pursuant to her scheme with the Trusts, never informed the board when she engaged in secret negotiations with Ecolab for the sale of AnAerobics. Creel did, however, inform the Trusts about her negotiations. The Trusts then began to solicit the shares of Series A Preferred stock held by ITV and the other Institutional Investors. The trusts explained to the Institutional Investors that the sale of shares must happen quickly. ITV agreed to sell its shares if the Trusts envisioned a time horizon with AnAerobics exceeding two to three years. The Trusts told ITV that they "envisioned a longer time horizon in the Company than ITV and Sterling." (First Am. Compl. ¶ 87.) Frustrated with the Trusts' control of AnAerobics, on January 29, 2007, ITV agreed with the terms Frautschi, acting for the Trusts, submitted in a letter, and sold two-thirds of its shares to the Trusts. Six months later, AnAerobics was sold to Ecolab for $210,000,000, gaining a $40,000,000 profit for the Trusts, and costing ITV about $9,000,000 in losses.

ITV brings ten causes of action against Defendants:

I.     Breach of fiduciary duty against Creel and Frautschi

II.    Breach of fiduciary duty against the Trusts

III.   Lender liability for breach of fiduciary duty against the Trusts

IV.    Aiding and abetting breach of fiduciary duty against Frautschi and the Trusts

V.     Unjust enrichment against the Trusts and Creel

VI.    Tortious interference with business relationships against the Trusts and Creel

VII.   Tortious interference with business relationships against the Trusts and Creel

VIII.  Securities fraud against the Trusts, Frautschi and Creel

IX.    Common law fraud against the Trusts, Frautschi and Creel

X.     Civil conspiracy against the Trusts, Frautschi and Creel


**STANDARDS OF LAW**

The U.S. Supreme Court, in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), clarified the standard to be applied to a 12(b)(6) motion:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a Plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id*. at 1964-65 (citations and internal quotations omitted). *See also*, *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (quoting *Bell Atl. Corp. v. Twombly*) (footnote omitted); *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007) (Indicating that *Bell Atl. Corp. v. Twombly* adopted "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible[,]" as opposed to merely conceivable.)

When applying this standard, a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (1999), *cert. denied*, 531 U.S. 1052 (2000). On the other hand, "[c]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss." *Hirsch v. Arthur Andersen & Co*., 72 F.3d 1085, 1092 (2d Cir. 1995)(*citing In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 400-01 n. 3 (2d Cir.1994)).

"In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir., 1991).The Court must view the complaint, and draw all reasonable inferences, in the light most favorable to the non-moving party. *Id.*; *see also* 2 MOORE'S FEDERAL PRACTICE, § 12.34[1][b] (Matthew Bender 3d ed.) (court must accept plaintiff's factual allegations as true). Under the modern rules of pleading, a plaintiff need only provide "a short and plain statement of the claim showing

that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and that "all pleadings shall be so construed as to do substantial justice," Fed. R. Civ. P. 8(f). On a Rule 12(b)(6) motion, the issue before the Court "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claim." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995).

> Finally, while the plaintiff need not set out in detail the facts upon which he bases a claim, he must provide the "defendant fair notice of the nature of the claim and the grounds upon which it rests." *Washington v. James*, 782 F.2d 1134, 1140 (2d Cir. 1986) (*quoting Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 [1957]). Where the allegations are so baldly conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains, they are meaningless as a practical matter and legally insufficient to state a claim. *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)(*citing Ostrer v. Aronwald*, 567 F.2d 551, 553 [2d Cir. 1977]; *Koch v. Yunich*, 533 F.2d 80, 85 (2d Cir. 1976); *Powell v. Jarvis*, 460 F.2d 551, 553 [2d Cir. 1972]).

*Parisi v. Coca-Cola Bottling Co.*, 995 F. Supp. 298, 300–01 (E.D.N.Y. 1998).


**ANALYSIS**

***Counts I and II – Breach of Fiduciary Duty against Creel, Frautshci & the Trusts***

The Trusts, Frautschi and Creel all move to dismiss the causes of action alleging breach of fiduciary duty arguing that they fail to state a cause of action and that they are derivative claims which ITV has no standing to bring. The Court disagrees.

Since AnAerobics was a Delaware company, the parties agree that Delaware substantive law applies. Under that law, a claim by a shareholder that the company's value is diluted through an officer's breach of fiduciary duty can be both a direct claim and a derivative claim. Under the heading, "The Proper Analysis to Distinguish Between Direct

and Derivative Actions," the Delaware Supreme Court, in *Tooley v. Donaldson, Lufkin &*

*Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), said,

> The analysis must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy? This simple analysis is well imbedded in our jurisprudence, but some cases have complicated it by injection of the amorphous and confusing concept of "special injury."

*Tooley*, 845 A.2d at 1035 (footnote omitted). As the Supreme Court of Delaware explained

in *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006):

> There is, however, at least one transactional paradigm—a species of corporate overpayment claim—that Delaware case law recognizes as being both derivative and direct in character.… A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.… Because the means used to achieve that result is an overpayment (or "over-issuance") of shares to the controlling stockholder, the corporation is harmed and has a claim to compel the restoration of the value of the overpayment. That claim, by definition, is derivative.

> But, the public (or minority) stockholders also have a separate, and direct, claim arising out of that same transaction. Because the shares representing the "overpayment" embody both economic value and voting power, the end result of this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited.… In such circumstances, the public shareholders are entitled to recover the value

> represented by that overpayment—an entitlement that may be claimed by
> the public shareholders directly and without regard to any claim the
> corporation may have.

*Gentile*, 906 A.2d at 100. Here, the first amended complaint alleges that the harm was

suffered by ITV, not AnAerobic, and ITV would benefit from the remedy, not AnAerobic,

or Ecolab. Accordingly, the Court rejects Defendants' lack of standing arguments.

Turning to the merits of the claims, Creel argues that ITV's cause of action is really

one for breach of contract. (Creel Mem. of Law, at 14.) However, ITV counters that it does

not rely on some characteristic specific to the Series A Preferred stock, but only on the

attributes of its stock holdings that were common to all stockholders. As the court held in

*Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584 (Del. Ch. 1986),

> with respect to matters relating to preferences or limitations that distinguish
> preferred stock from common, the duty of the corporation and its directors
> is essentially contractual and the scope of the duty is appropriately defined
> by reference to the specific words evidencing that contract; where however
> the right asserted is not to a preference as against the common stock but
> rather a right shared equally with the common, the existence of such right
> and the scope of the correlative duty may be measured by equitable as well
> as legal standards.

*Jedwab*, 509 A.2d at 594. The diminution in value and control over the corporation did not

result from a preference or limitation of the preferred stock. Thus, the claim does not sound

in contract, as Creel contends. Accordingly, her motion to dismiss Count I is denied.

Frautschi asserts that ITV has not alleged that any act he committed while a

member of the board of directors breached a fiduciary duty owed to ITV. ITV responds that,

before Frautschi resigned his position on the board of directors, Creel agreed to collude

with him to gain control of AnAerobics in return for raising her compensation. The Court

determines that the allegations in the first amended complaint do raise a plausible claim

that Frautschi breached his fiduciary duty as a director, that the business judgment presumption, *Parnes v. Bally Entertainment Corp.*, 722 A.2d 1243, 1246-47 (Del. 1999), is overcome and that the allegations comply with Federal Rules of Civil Procedure 8 and 9(b).

With regard to the Trusts, they argue that ITV has not alleged facts showing that they controlled AnAerobics such that a fiduciary duty was triggered, and that the claims are derivative. The Court disagrees. Under Delaware law,

> [i]t is well settled…that only a "controlling stockholder" owes fiduciary duties to other stockholders. A stockholder can meet this "control" test in one of two ways. First, ownership of more than 50% of the voting power of a corporation satisfies the "control" test. Alternatively, a stockholder stands as a fiduciary if it "exercises control over the business and affairs of the corporation."

> For the plaintiffs to survive a motion to dismiss, they must allege domination by KKR through actual control of Primedia's corporate conduct. The bare allegation that KKR possessed the potential ability to exercise control is insufficient. However, the plaintiffs need not demonstrate that KKR oversaw the day-to-day operations of Primedia. Allegations of control over the particular transaction at issue are enough.

*In re Primedia Inc., Derivative Litig.*, 910 A.2d 248, 257 (Del. Ch. 2006) (citations omitted). ITV alleges that the Trusts controlled the corporation, since by agreeing to help Creel increase her compensation, it induced her to convince the board to take actions that enhanced the Trusts' leverage over the corporation. ITV further alleges that Creel acted as the Trusts' secret agent and prevented the corporation from obtaining financing from sources other than the Trusts, thus enabling the Trusts to obtain a bigger stake in the corporation, until they finally owned more than fifty per-cent of the stock. As was the case in *In re Primedia Inc, Derivative Litig.*, the Trusts' control over the corporation caused the corporation "to enter into an unfair self-dealing transaction without any procedural

safeguards" for protection of ITV's interests. ITV's breach of fiduciary claim against the Trusts is plausible and is sufficiently plead under Federal Rules of Civil Procedure 8 and 9(b). Accordingly, the Trusts' motion to dismiss the fiduciary duty claims is denied.

**Count III – Lender liability against the Trusts**

ITV alleges a claim of lender liability against the Trusts. The elements of such a claim are discussed in the case ITV cites as authority, *Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Serv.* (*In re KDI Holdings, Inc.*), 277 B.R. 493 (Bankr. S.D.N.Y. 1999). In that case, the bankruptcy court wrote:

> Lender liability is established by application of the instrumentality doctrine, which requires:
>
> > (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
> >
> > (2) Such control must have been used by the defendant to commit fraud or worse, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
> >
> > (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.
>
> *Fisser v. International Bank*, 282 F.2d 231, 238 (2d Cir. 1960) (citing *Lowendahl v. Baltimore & Ohio R.R. Co.*, 247 App. Div. 144, 287 N.Y.S. 62, 76, aff'd., 272 N.Y. 360, 6 N.E.2d 56) (1936). To establish lender liability through the use of the instrumentality doctrine in the context of a creditor-debtor relationship, "courts require a strong showing that the creditor assumed actual, participatory and total control of the debtor. Merely taking an active part in the management of the debtor corporation does not automatically constitute control…." *Kirov Industrial Supply Co. v. National Distillers and Chem. Corp.*, 483 F.2d 1098, 1105 (5th Cir. 1973), *reh'g denied*, 490 F.2d 916 (5th Cir. 1974). *See also National Westminster Bank*

*USA v. Century Healthcare Corp.*, 885 F. Supp. 601, 603 (S.D.N.Y. 1995) (quoting *Kirov*). Moreover,

> lender liability is predicated on an unmistakeable showing that the subservient corporation in reality has no separate, independent existence of its own and was being used to further the purposes of the dominant corporation. Suggestions by a major lender for a defaulted debtor, even when coupled with a threat of the exercise of its legal rights if the debtor does not comply, are both commonplace and completely proper.

*National Westminster*, 885 F. Supp. at 603.

*Id.*, 277 B.R. at 515-16. ITV argues that, "Even though the [Trusts] did not gain effective majority stock ownership until the 2006 Financing was finalized, the [Trusts]' ability to continually threaten foreclosure coupled with their control over the CEO gave them effective control over the affairs of Ecovation." (ITV's Mem. of Law (Docket No. 15) at 19.) Nevertheless, the Trusts contend that ITV cannot meet the standard spelled out in *In re KDI Holdings* to allege facts showing that Ecovation had no "separate, independent existence of its own…." *National Westminster*, 885 F. Supp. at 603. (*See* Trusts' Reply Mem. of Law (Docket No. 23) at 7.) The first amended complaint alleges that Creel, Frautschi and the Trusts were acting in collusion, even before the Trusts became majority shareholders, to exercise control over AnAerobics to the detriment and harm of ITV. At this stage, the Court finds that ITV has sufficiently plead facts showing that its claim of lender liability is plausible.

### Count IV – Aiding and Abetting Claims

Turning to the aiding and abetting claims, the Court determines first that the first amended complaint does allege an actionable breach of fiduciary duties claim against

Creel. The allegations are that Creel purposely did not seek financing outside of the Trusts in order to hold up her bargain with the Trusts and obtain better compensation for herself. With regard to the allegations against Fratuschi, ITV argues that it should be permitted to plead aiding and abetting against him not only as a separate claim (for the time he was a member of the board of directors), but also an alternative to the allegation of a direct breach of fiduciary duty. ITV argues that its "aiding and abetting claim is based upon the substantial assistance that Frautschi and the Guarantors provided to Creel in breaching her fiduciary duties to Ecovation even after Frautschi resigned from the Board in 2005." (ITV Mem. of Law (Docket No. 17) at 9.) The allegations in this regard reach beyond the time that Frautschi was a member of the board, and, in any event, create a plausible alternative pleading as permitted by Federal Rule of Civil Procedure 8(d)(2).

Turning to Frautschi's motion to dismiss this Count, he contends that since ITV failed to allege a cause action for breach of fiduciary duty against Creel, Frautschi cannot be said to have aided and abetted her in the breach. Second, Frautschi contends that someone who has allegedly breached a fiduciary duty cannot also, by the same conduct, be said to have aided another to breach a fiduciary duty. Third, Frautschi contends that because ITV's underlying claim for breach of fiduciary duty against Creel is based on fraud, ITV "must plead facts supporting a claim for aiding and abetting that breach of fiduciary duty with particularity and with specific emphasis on defendant's alleged knowledge, or scienter, of the alleged breach." (Frautschi Mem. of Law (Docket No. 7-2) at 9.) Finally, Frautschi contends that this claim is derivative.

The Court rejects Frautschi's first contention, since it has determined that ITV sufficiently plead a cause of action against Creel for breach of fiduciary duty. Second, the

Court accepts ITV's argument that its aiding and abetting claim against Frautschi is an acceptable alternative pleading to his own breach of fiduciary duty. Fed. R. Civ. P. 8(d)(2). Third, ITV has plead with specificity that Frautschi aided and abetted Creel and the Trusts in their alleged breaches of fiduciary duty. In particular, the first amended complaint contains the following allegations pertinent to this Count:

> 37. Creel's participation was an important part of the Lenders' scheme. Upon information and belief, the Lenders and Frautschi obtained Creel's cooperation by promising Creel a more lucrative compensation package once the Lenders gained control of the Company.

> 38. Pursuant to the Defendants' scheme, Frautschi resigned from the Board in or about early November, 2005. Upon information and belief, Frautschi resigned from the Board so he could actively engage in his scheme with Creel to benefit the Lenders without raising suspicion among other Board members that he was secretly colluding with Creel and concerned solely for his own interests and the interests of the Lenders.

> 39. Upon information and belief, Creel agreed with Frautschi to demand from the Board that the Company release Frautschi from all liability associated with his duties on the Board in exchange for an extension of the Waiver.

> 40. At a Board meeting held on January 25, 2006, Creel presented the purported results of her recent "negotiations" with the Lenders regarding an extension of the Waiver and explained that the Lenders demanded that the Company release Frautschi from liability relating to his actions a member of the Board. Trusting that Creel was not in collusion with Frautschi and the Lenders, the Board requested that Creel attempt to negotiate the extension under better terms, and to thoroughly analyze all the potential repercussions of releasing Frautschi from liability as a Board member....

> 42. Pursuant to her scheme with Frautschi and the Lenders, Creel recommended to the Board that the Company should agree to the release and the extension of the Waiver as dictated by the Lenders. Creel's recommendation was made for the sole purpose of advancing her personal interests and those of Frautschi and the Lenders and at the expense of the other shareholders of the Company, like ITV....

> 70. Upon information and belief, Creel's promises to leave the Company included the threat that, should she leave the Company, the Lenders would back out of the financing under the Lender Term Sheet.…

> 83. Pursuant to Creel's scheme with the Lenders, Creel quickly informed the Lenders of the same. Creel and the Lenders immediately began to engage in secret negotiations with Ecolab regarding the sale of the Company.

> 84. Neither Creel nor the Lenders ever informed the Institutional Investors, including ITV, about Ecolab's interest in purchasing the Company and/or the secret negotiations with Ecolab regarding the same.

(First Am. Compl. ¶¶ 37–40, 42, 70 & 83–84.) Finally, as discussed in detail above, this claim is not derivative. *See* Tooley, 845 A.2d 1031, and *Gentile*, 906 A.2d 91.

> The Trusts also move to dismiss this count against them, arguing that,

> the amended complaint never alleges facts showing that the Trusts had knowledge of her alleged breaches, or identifies how they aided her supposed misconduct. Moreover, the claim is plainly derivative. Based on the authorities cited in Mr. Frautschi's motion to dismiss, the aiding and abetting claims must be dismissed.

(Trusts' Mem. of Law (Docket No. 5-2) at 12.) As previously indicated, the Court finds that the allegations in the first amended complaint, sufficiently allege facts to make this claim of aiding and abetting plausible. Further, as also discussed above, the Court determines that under Delaware law, the aiding and abetting claims are not derivative.

### Count V – Unjust Enrichment against the Trusts and Creel

ITV's "Memorandum of Law…in Opposition to the Motion to Dismiss of Defendants Pleasant T. Rowland Revocable Trust and W. Jerome Frautschi Living Trust" (Docket No. 15), ITV argues against the Trusts' motion to dismiss Count V. As Creel points out in her reply memorandum of law, however, ITV did not oppose *her* motion to dismiss Count V. Accordingly, Creel's motion to dismiss Count V against her is granted.

"Unjust enrichment is an equitable remedy that is available in cases where there is no contract between the parties." *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 530 (S.D.N.Y. 2007) (citation omitted). "To state a claim for unjust enrichment in New York, a plaintiff must allege that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution." *Id*. (quoting *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004)). The Trusts contend that ITV's claims under this count are derivative and that ITV's attempt to argue that other shareholders, who were not parties to the Investor Rights Agreement, were also harmed, should be rejected as ITV has not plead a class action and, thus, has no standing to advance the rights of others.

For the same reasons stated in *Jedwab*, 509 A.2d at 594, the Court rejects the Trusts' argument. The diminution in value and control over the corporation did not result from a preference or limitation of the preferred stock. Consequently, the claim does not sound in contract, as the Trusts contend. Further, applying *Tooley*, 845 A.2d 1031, and *Gentile*, 906 A.2d 91, the Court determines that the unjust enrichment claim is not a derivative action. Accordingly, the Trusts' motion to dismiss Count V is denied.

### Counts VI and VII – Tortious Interference

Creel, citing New York case law, contends that ITV has not properly plead that she created "*third party* interference with the contract or business relationship at issue because Creel, as a director and officer of the Company, is not a third party for these purposes." (Creel Mem. of Law (Docket No. 11) at 15.) Creel further argues that, "for either Count VI or Count VII to survive dismissal, ITV must have pleaded (at a minimum) third party interference with the contract or prospective business relationship at issue." (Creel Mem.

of Law (Docket No. 11) at 16.) In this regard, the New York State Supreme Court, Appellate Division, First Department held:

> To establish a corporate officer's liability for inducing a breach of a contract between the corporation and a third party, the complaint "must allege that the officers' … 'acts were taken outside the scope of their employment or that they personally profited from their acts'." (*Courageous Syndicate v People-To-People Sports Comm.*, 141 AD2d 599, 600, quoting *Citicorp Retail Servs. v Wellington Mercantile Servs.*, 90 AD2d 532.) *Buckley v 112 Cent. Park S.* (285 App Div 331), cited favorably by the Court of Appeals in *Murtha v Yonkers Child Care Assn.* (45 NY2d 913, 915), involved a claim that the corporate officer defendants conspired to deprive plaintiff of his commissions. This Court, in finding that the complaint sufficiently pleaded a cause of action for tortious interference, stated, "[W]hen, if as here, the officer commits fraudulent, deceitful acts motivated by a personal desire for monetary gain at the expense of the plaintiff, we see no reason to shroud him with a mantle of immunity upon the fictitious theory that he was protecting the interests of the corporation, its stockholders and creditors in the performance of his duties as a corporate officer." (285 App Div, supra, at 335.)

*Hoag v. Chancellor*, 246 A.D.2d 224, 229 (N.Y. App. Div. 1st Dep't 1998). ITV alleges in the first amended complaint that Creel frustrated ITV's attempt to finance Evocation in 2006, because Frautschi and the Guarantors offered her what they term was a bribe—an unwarranted raise in her compensation. Likewise, the first amended complaint also alleges that Creel helped the Guarantors alleged scheme to gain control of AnAerobics, again in return for "a more lucrative compensation package once the Lenders gained control of the Company." (First Am. Compl. ¶ 37.) These allegations show that Creel acted outside the scope of her employment and fit the requirements outlined above for tortious interference claims. Accordingly, Creel's motion to dismiss Counts VI and VII is denied.

With regard to Count VI, the Trusts argue that since ITV alleges they were parties to the Term Sheet (the contract with which they supposedly interfered), Count VI is not

plausible against them. ITV responds that, "[w]hether the Guarantors were third parties to these agreements is clearly a fact issue that must be resolved through discovery, and not on a motion to dismiss." (ITV Mem. of Law (Docket No. 15) at 22.)

In *Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167 (W.D.N.Y. 2003), the Court reviewed the elements of a tortious interference with business relationship claim:

> Under New York law, the elements of a claim for tortious interference with prospective business relations are: (1) business relations with a third party, (2) the defendant's interference with those business relations, (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means, and (4) injury to the business relationship.

*Id.*, 287 F. Supp. 2d at 177 (citing *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir.2000) (citing *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir.1994)).

In the first amended complaint, ITV alleges that, "ITV developed a business relationship with AnAerobics when Creel, acting on behalf of AnAerobics, requested that the Institutional Investors, including ITV, prepare a term sheet outlining the structure of further investment in the Company by the Institutional Investors." (First Am. Compl. ¶ 141.) ITV alleges that the Trusts and Creel interfered with the business relationship ITV had with AnAerobics by rejecting the term sheet. However, as the Trusts argue, they were parties to the proposed term sheet that was rejected by AnAerobics. In *Astor Holdings, Inc. v. Roski*, No. 01 Civ. 1905 (GEL), 2002 U.S. Dist. LEXIS 758 (S.D.N.Y. Jan. 15, 2002), the district court noted that,

> In the very nature of this tort, an existing contract is not required to state a claim for tortious interference with prospective business relations. *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir. 1998); *Volvo N. Am. Corp. v. Men's Intern. Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988). However, there is a threshold requirement that a plaintiff "must specify some particular, existing business relationship through which plaintiff would have done business but for the allegedly tortious behavior." *Six West Retail*, 2000 U.S.

> Dist. LEXIS 2604 at *101 (citing *Minnesota Mining and Mfg. Co. v. Graham-Field, Inc.*, 1997 U.S. Dist. LEXIS 4457, 1997 WL 166497 at *7 (S.D.N.Y. Apr. 9, 1997) (internal citations omitted); *see also Envirosource, Inc. v. Horsehead Resource Dev. Co.*, 1996 U.S. Dist. LEXIS 9099, 1996 WL 363091 at 14 (S.D.N.Y. 1996).

*Id.*, 2002 U.S. Dist. LEXIS 758 at *59–60. ITV also alleges that, "[a]s a direct and proximate result of the interference by the [Trusts] and Frautschi, the business relationship that ITV had with AnAerobics was injured because the Investor Term Sheet was not ultimately accepted by the Board, and ITV never enjoyed the opportunity to make further investments in AnAerobics. In addition, the rejection of the Investor Term Sheet directly and proximately injured ITV because the Board's acceptance of the [Trusts] Term Sheet in lieu of the Investor Term Sheet severely diluted the value of the shares owned by ITV in AnAerobics. (First Am. Compl. ¶ 147.) The Court finds that although the pleading relies on the Investor Term Sheet, to which the Trusts were a potential party, the allegations also show that as a result of the Trusts interference with ITV's relationship to AnAerobics, ITV was no longer able to participate in financial arrangements with AnAerobics. Accordingly, the Court determines that ITV has plead a plausible claim of tortious interference.

Turning to Count VII, the Trusts argue that the contract with which they are alleged to have interfered was the right of first refusal contained in the Investor Rights Agreement. (*See* First Am. Compl. ¶ 150 ("During the relevant time period, ITV engaged in a business relationship with the Company pursuant to the Investor Rights Agreement and the Right of First Refusal provision contained therein.") However, as the Trusts point out, the Investor Rights Agreement did not offer the right of first refusal to ITV with regard to debt financing. The Investor Rights Agreement states in pertinent part,

(e) Notwithstanding the provisions of this Section 4.1, the Company shall not be required to first offer the Equity Securities to the Rights Holders pursuant to this Section 4.1, if: …(vi) the issuance is in connection with:…(B) equipment leasing, debt financing or other similar transaction; and approved by the Board, which approval must include at least. a majority of the directors elected to represent to the holders of Series A Preferred pursuant to the Voting Agreement; or (vii) the issuance is approved by the holders of at least two-thirds (2/3) of the then outstanding shares of Series A Preferred.

(First Am. Compl. Ex. 3B ¶ 4.1(e).) ITV alleges that, "By forcing the Company to accept the Lenders' financing as debt financing, the Lenders and Creel circumvented and frustrated the purpose of the Right of First Refusal provision and the Amended Certificate and thereby interfered with the business relationship that ITV had with the Company." (First Am. Compl. ¶ 154.) The Investor Term Sheet as it pertains to the right of first refusal was a debt financing proposal, listing AnAerobics as the borrower and setting an annual interest rate and maturity date for the notes. (First Am. Compl. Ex. 4, at 1–2.) Accordingly, the Trusts alleged interference with ITV's right of first refusal, the basis for ITV's Count VII claim against the Trusts, is not plausible, since ITV did not have the right of first refusal with regard to debt financing. Further, the loan from the Trusts was unanimously approved by the board of directors. (First Am. Compl. ¶ 61.) However, neither the Trusts memorandum in support of its motion, nor its reply memorandum, addresses ITV's allegation that it "was also engaged in a business relationship with the Company through the Amended Certificate, which provided ITV with certain anti-dilution rights." (First Am. Compl. ¶ 152.) Accordingly, at this stage of the lawsuit, the Court determines that the first amended complaint states a plausible claim with regard to tortious interference with ITV's relationship to AnAerobics based on the Amended Certificate's anti-dilution rights.

***Count VIII — Securities Fraud Claim***

Creel argues that ITV has not sufficiently plead a cause of action against her pursuant to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. She contends that the allegations in the first amended complaint do not show (1) that the existence of the secret negotiations with Ecolab were material; (2) that Creel had a duty to disclose her inside knowledge about the secret negotiations that she facilitated; and (3) that ITV met the heightened pleading standard for scienter under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). In addition, Creel argues that,

> ITV's attempt to plead "scheme" liability also is unsuccessful. ITV has not pleaded any deceptive conduct by Creel on which it supposedly relied in making the decision to sell its preferred stock to the Lenders. As such, its "scheme" claim amounts to nothing more than an invalid claim that Creel aided and abetted fraud by the Lenders.

(Creel Mem. of Law (Docket No. 11) at 22 (citation omitted).)

In assessing Creel's argument, the Court is mindful of the Supreme Court's admonishment that the determination of materiality,

> requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment.

*Tsc Indus. v. Northway*, 426 U.S. 438, 450 (1976). Although the Court is assessing the first amended complaint under Rule 12, and not making a summary judgment decision, the implication of Justice Marshall's words is that materiality is generally a jury question. The allegations in the first amended complaint, particularly in paragraphs 87–89, 93 and 98, sufficiently allege materiality to defeat a motion to dismiss.

With regard to whether ITV has plead scienter sufficiently to meet the requirements of the PSLRA, ITV relies on the test set out in *In re: Pronetlink Sec. Litig.*, 493 F. Supp. 2d 330, 335–36 (S.D.N.Y. 2005). That case quotes from *Shields v. Citytrust Bancorp.*, 25 F.3d 1124, 1128 (2d Cir. 1994). However, in *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1259 (10th Cir. 2001), the Tenth Circuit stated that,

> Prior to the passage of the PSLRA, the Second Circuit had held that a strong inference of fraudulent intent in securities fraud cases could be established either by: (1) alleging facts constituting strong circumstantial evidence of "conscious misbehavior or recklessness," or (2) alleging that Defendants had the motive and opportunity to commit securities fraud. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). As noted above, however, the PSLRA heightened the pleading requirements for securities fraud cases generally, and particularly in regard to the scienter element, and the legislative history suggests that Congress specifically intended a pleading standard stricter than the standard then prevailing in the Second Circuit.

*City of Philadelphia*, 264 F.3d at 1259. Nevertheless, the Fourth Circuit has observed that,

> In enacting the PSLRA, Congress adopted the "strong inference" language used by the Second Circuit, which it regarded as the most stringent pleading standard in the country. *See* S. Rep. No. 104-98, at 15 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 694. However, it is not clear whether Congress also intended to adopt the Second Circuit rule permitting plaintiffs to show a strong inference by alleging facts demonstrating motive and opportunity. Following enactment of the PSLRA, the Second Circuit reaffirmed its pre-PSLRA standard. *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 537-38 (2d Cir. 1999) (stating that the PSLRA "heightened the requirement for pleading scienter to the level used by the Second Circuit").

*Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 345 (4th Cir. 2003). Accordingly, the Court will apply the Second Circuit standard, which the Court understands includes the following:

> As a pleading requirement, a plaintiff must either (a) allege facts to show that "defendants had both motive and opportunity to commit fraud" or (b) allege facts that "constitute strong circumstantial evidence of conscious

misbehavior or recklessness." *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).…

*Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) (citation omitted).

As of February 17, 2010, *Press* is still good law. Applying that standard to the first amended complaint, the Court determines that ITV has sufficiently plead scienter. ITV contends that,

> The motives of the Defendants are abundantly clear on the face of the First Amended Complaint—Frautschi and the Guarantors sought to obtain ITV's shares at an unreasonably low price, and Creel sought to unreasonably improve and/or maintain her unwarranted compensation package that she received as a bribe for her participation in the scheme. Am. Cmpl. ¶¶ 22, 37, 70, 74.

(ITV Mem. of Law (Docket No. 13) at 19.) The Court agrees with ITV that the first amended complaint alleges a sufficient factual basis to meet either test.

### Count IX – Common Law Fraud

Both Creel and Frautschi have moved to dismiss the common law fraud claims against them. The parties agree that the considerations under New York law for common fraud are the same as those under Federal securities law, discussed above. ITV contends that the requirement for specificity in pleading a New York claim of common law fraud "is decidedly lower than for pleading a securities fraud claim." (ITV Mem. of Law (Docket No. 17) at 23 n.12.) As the district court observed in *In re Complete Management Inc. Securities Litig.*, 153 F. Supp. 2d 314, 324 (S.D.N.Y. 2001), "the plain language of the PSLRA indicates that the particularity requirement is undoubtedly somewhat higher than that of Rule 9(b)." Thus, the Court determines that since ITV has sufficiently plead a Federal securities claim under the PSLRA, its allegations are sufficient to support its claim of common law fraud as well.

### Count X – Civil Conspiracy

Creel moves to dismiss ITV's civil conspiracy to commit fraud claim against her. She contends that since ITV's fraud claim cannot stand, neither should its conspiracy claim. (Creel Mem. of Law (Docket No. 11) at 23.) Since the Court has not dismissed the fraud claim, it rejects this argument. Creel also argues that ITV has failed to allege, as it must, "harm from an unlawful act in furtherance of the conspiracy, not merely harm from the conspiracy." (*Id.* at 24.) Creel notes that New York and Delaware law are not in conflict on this requirement. (*Id.* at 25 n. 14.)

> "In alleging conspiracy, the plaintiff carries the burden of proving (1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage."

*Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986) (quoting *Suarez v. Underwood*, 103 Misc.2d 445, 447 (N.Y. Sup. Ct. 1980)). Agreeing that New York law requires pleading that harm has resulted from the underlying act, Plaintiffs point out that in paragraph 177 of the first amended complaint they allege that, "[a]s a direct and proximate result of the Defendants' fraudulent actions, ITV suffered damages in connection with the sale of its shares in the Company to the Lenders." Additionally, ITV alleged that, "As a direct and proximate result of the Defendants' conspiracy to commit fraud, ITV suffered damages in connection with the sale of its shares in the Company to the Lenders." (First Am. Compl. ¶ 184.) The Court determines that ITV has sufficiently alleged harm resulting from the underlying fraudulent acts alleged in the first amended complaint in a manner sufficient to raise a plausible claim of conspiracy under New York law.

**CONCLUSION**

For the reasons stated above, Creel's motion to dismiss Count V alleging unjust en-richment against her is granted and otherwise, Defendants' motions to dismiss (Docket Nos. 5, 7 & 10) are denied.

IT IS SO ORDERED.

Dated:   February 23, 2010
         Rochester, New York

               ENTER:

                     /s/ Charles J. Siragusa
                     CHARLES J.  SIRAGUSA
                     United States District Judge