**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

INDUSTRIAL TECHNOLOGY
VENTURES LP,

                Plaintiff,

                                  DECISION & ORDER

       -vs-                        08-CV-6227T

PLEASANT T. ROWLAND REVOCABLE
TRUST, W. JEROME FRAUTSCHI LIVING
TRUST, W. JEROME FRAUTSCHI, and
DIANE C. CREEL,

                Defendants.

_____

## INTRODUCTION

Plaintiff Industrial Technology Ventures LP ("ITV"), a Georgia Limited Partnership, brings this diversity action against Defendants Pleasant T. Rowland Revocable Trust, W. Jerome Frautschi Living Trust, (collectively "the Trusts"), W. Jerome Frautschi individually, and Diane C. Creel, claiming that the defendants violated the Securities Exchange Act of 1934 ("Exchange Act") and committed various State law torts in connection with the financing and eventual sale of a company known as Ecovation ("the Company"),  a start-up wastewater treatment technology company located in Rochester, New York.   Specifically, ITV, which had invested in

Ecovation, claims that Creel, the CEO, Chairman of the Board, and President of Ecovation, at all relevant times, *inter alia,* conspired with the defendant Trusts, who had also invested in Ecovation and had guaranteed several loans made to Ecovation, to enrich themselves at the expense of other investors in the Company.  ITV alleges that the defendant Trusts took advantage of Ecovation's need for capital, and with Creel's assistance, obtained control of the Company by providing loan guarantees to the Company. In doing so, ITV contends that the defendants acted at the expense of the Company's remaining shareholders, whose investments were severely diluted as a result of defendants' alleged conduct.  ITV claims, *inter alia,* that the defendants fraudulently induced ITV and other shareholders to sell a substantial number of shares in the Company for an unreasonably low price in light of the material facts known only to the defendants at the time of the sale, and intentionally withheld from ITV and other shareholders.

Plaintiff alleges ten counts against the defendant including claims of: (1) breach of fiduciary duty against Creel and Frautschi; (2) breach of fiduciary duty against the Trusts; (3) lender liability for breach of fiduciary duty against the Trusts; (4) aiding and abetting breach of fiduciary duty against Frautschi and the Trusts; (5) unjust enrichment against the Trusts;

(6) two separate claims of tortious interference with business relationships against the Trusts and against Creel; (7) securities fraud against all Defendants; (8) common law fraud against all Defendants; and (9) civil conspiracy against all Defendants. Dkt. No. 116.

Currently pending before the Court are three motions for summary judgment filed by all four defendants.[1]   Individual defendants Creel and Frautschi have each filed motions seeking summary judgment against ITV on all counts pending against them. Dkt. Nos. 134, 138. The defendant Trusts have filed a joint motion for summary judgment against ITV asking that the complaint against the trusts be dismissed in its entirety.   Dkt. No. 136.  For the reasons stated below, the Trusts' motions are granted in part and denied in part, and the individual defendants' motions are denied.

## BACKGROUND

The following facts are drawn from the parties' voluminous Rule 56 statements,[2] and will be summarized in their most abbreviated form. As is

---

[1]  By Order dated April 23, 2015, this action was transferred to the Honorable Michael A. Telesca.

[2]  The Court notes that Plaintiff ITV's Rule 56 submissions run afoul of Local Rule 56(a)(3), which requires valid citations to admissible evidence, essentially "inviting this Court to peruse a haystack looking for needles."  *Fernandez v. DeLeno*, 71 F.Supp.2d 224, 227 (S.D.N.Y. 1999). While the Court notes the deficiency in ITV's opposition, this Court has "broad discretion to determine whether to overlook a party's failure to comply with local rules." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95. 108 n.2 (2d Cir. 2006) (internal quotation marks omitted) (citations omitted). Therefore, the Court in its discretion will overlook ITV's non-compliance with the Local Rules on this occasion, but Plaintiff's counsel is reminded to comply with Local Rule 56 in future filings with the Court.

required, they are viewed in the light most favorable to ITV, as the non-moving party.

### I.    The Parties

Plaintiff ITV is a venture capital firm that invests in emerging businesses.   In 2002, Ecovation, a start-up Company engaged in the business of wastewater treatment, was seeking capital to expand its business.  ITV invested in Ecovation, and as part of its agreement to invest in the Company, ITV appointed one of its managers, Edward Wilson ("Wilson") to became a member of the Board of Directors of Ecovation. Several other investors also invested in Ecovation at that time.  Sterling Venture Partners, L.P. ("Sterling"), a private equity fund, invested in the Company and appointed Eric Becker ("Becker") to sit on Ecovation's Board.  As owners of preferred stock, ITV and Sterling (the "Institutional Investors") enjoyed, in addition to the right to designate Board members, liquidation preferences, and rights of first refusal on future equity.   In September, 2002, Evocation filed an Amended Certificate of Incorporation that created and defined the rights associated with Series A preferred stock.

Pleasant Rowland and her husband, defendant Jerome Frautschi, also invested in Ecovation through their trusts, the Pleasant T. Rowland

Revocable Trust and the W. Jerome Frautschi Living Trust. In addition to investing in Ecovation, the Trusts also guaranteed significant loans made to Ecovation.  Defendant W. Jerome Frautschi also became a member of the Board of Directors of Ecovation.

In 2003, Ecovation hired Diane Creel ("Creel"), former Chairman and CEO of Earth Tech, another business in the environmental engineering sector, to serve as Ecovation's CEO, President, and Chair of the Board of Directors.  Pursuant to her employment agreement, Creel was to serve for a period of two years with an automatic renewal for an additional two years. Creel testified that she came to Ecovation seeking "an opportunity for me to try to build another company . . . . So I went from 9,000 employees to 11, flying around on private jets to riding in coach, having a driver in L.A. to driving my own SUV through the snow in Rochester to have that opportunity to try to grow another business." Pl. Ex. 5 (Creel Dep.) 28-32.

Creel's compensation package included an annual salary of $435,000 along with a potential annual bonus and 1.2 million common stock options at $.95 per share.  Under the terms of her employment agreement, the Compensation Committee of the Board of Directors had discretion over Creel's compensation and bonus.

Frautschi, Rowland, nor any of their agents had met Creel before she became CEO of Ecovation. Creel, however, had other professional relationships connecting her to Frautschi and other Board members.

## II.   Evocation's Existing and Proposed Lines of Credit

In 2002, the Company faced serious funding problems. It had raised some capital by issuing shares of Series A stock in 2002 and 2004, and also obtained a $4 million line of credit from U.S. Bank that was guaranteed by Frautschi. However, the Series A equity raise and the U.S. Bank loan were not sufficient to sustain the Company's rapid growth.

Ecovation considered entering into a $30 million financing agreement with Newcourt Capital U.S.A., Inc. ("CIT") in 2004. CIT provided the Company with proposed terms, but the negotiations did not result in a formal agreement. At that point the Trusts intervened and offered a loan to Ecovation with similar terms, and the Board authorized management to negotiate a formal loan agreement with the Trusts based on those terms.

The Trusts' Line of Credit ("Trusts' LOC") included a $6 million tangible net worth covenant to provide assurance that the Company could repay the loan. The loan agreement provided, among other things, that Creel would remain full-time President of the Company. Should Creel leave Ecovation for any reason, the Trusts would have the ability to immediately terminate

the loan. *See* Def. Ex. 83, §5.1. ("[A]ll notes shall be immediately pre-paid upon a change of control of the Borrower.") The final loan agreement also provided the Trusts with warrants to purchase common stock for $.50 per share in addition to any interest on any outstanding balance on the line of credit.

On June 30, 2004, Ecovation entered into the Trusts' LOC, which had a maturity date of December 31, 2006, and which provided Ecovation with the ability to borrow up to $30 million if it remained in compliance with the agreement. Frautschi joined the Board shortly after the execution of the Trusts' LOC.

The Trusts' LOC's Adjusted Tangible Net Worth covenant (the same as the one proposed by CIT) required the Company to maintain an adjusted net worth of $6 million in order to avoid default. Creel testified that she didn't get "overly concerned about" whether the Company would meet the net worth requirement because she thought it could be met. Creel Dep. at 321-22.

Ecovation breached this covenant by July of 2005, about one year later.  By Written Consent, the parties agreed that the Trusts would receive 500,000 shares of common stock at a price of $0.01 per share in exchange

for a waiver by the Trusts of the Company's breach of the Adjusted Tangible Net Worth Covenant through December 31, 2005.

In the meantime, the Board charged Creel with investigating financing options to cure the Company's default in the fall of 2005. Creel advised the Board in December, 2005, that the two companies interested in a possible acquisition of Ecovation, 3M and Veolia, would not entertain and/or commit to a proposal at that time. On December 21, the Board unanimously voted to retain J.P. Morgan to pursue a sale or refinancing of the Company.

Thus, when the debt alternatives did not come to fruition, Creel again presented the Board with a proposal from the Trusts extending the existing waiver to June 30, 2006, this time in exchange for converting the warrants to purchase shares of common stock into warrants to purchase Series A stock for $.50 per share. Creel urged the Board to accept the proposal, and the Board followed her recommendation, entering into a First Amendment and Waiver Agreement ("Waiver Agreement") with the Trusts on January 1, 2006. The Waiver Agreement shortened the life of the loan by six months, and provided the Trusts with regular business reports, the right to review any and all proposed design-build financing contracts as well as the opportunity to fund or not fund any design-build financing contract. During the Waiver Agreement negotiations, Frautschi resigned from the Board in

November, 2005, based on his concern that "there might be a possible conflict in that we had a major commitment in the financing of Ecovation." Pl. Ex. 8 (Frautschi Dep.) 60. Frautschi then negotiated and ultimately was granted a release and waiver of liability relating to his Board position as a condition of the extension of the waiver. His seat was then filled by Creighton "Kim" Early ("Early"), a former colleague of Creel's from Earth Tech on December 15, 2005. Creel continued to assure the Board that "06/30 will not be an issue." Pl. Ex. 62.

### III.      Competing Term Sheets

By April 2006, the Board began internal financing discussions, which involved the proposal of a bridge loan by Becker, Sterling's representative. Unbeknownst to Becker, the Trusts expressed to Creel a dislike for Sterling and the Institutional Investors in general.

On June 1, 2006, Creel reported to the Board that the sale process had failed, and requested a formal proposal for the potential bridge loan. She shared this information with the Trusts, and apprised them of Ecovation's financing needs.

The Institutional Investors submitted a term sheet outlining the terms of a proposed financing vehicle for Ecovation ("the Investor Term Sheet" or "ITS"), on June 14, 2006. Among other things, the ITS proposed an

$18 million bridge loan that was convertible into equity in order to finance operations and customer contracts while the Company finalized an even larger equity financing with existing and outside investors. At the time the ITS was submitted, Ecovation had already drawn more than $24 million on the Trusts' Line of Credit, and the June 30, 2006 maturity date was only two weeks away.

Two days later, Creel discussed the ITS with the Trusts' representative, but not with Frautschi or Rowland. Creel finally met with Frautschi and Rowland on June 19, 2006. During that meeting, the Trusts expressed willingness to negotiate a line of credit of $50 million under terms similar to the existing Line of Credit that was set to expire on June 30, 2006. Creel then informed the Board on June 20, 2006, six days after the ITS was submitted, that the Trusts would submit an amended term sheet in a few days. Creel's handwritten notes of her discussion with Board member Early on June 20, 2006, regarding the Trusts' alternative proposal indicate, "accept this agreement – [indecipherable] foreclose." Pl. Ex. 20.

On June 22, 2006, the Trusts submitted a competing proposal to the Investor Term Sheet ("Trusts' Term Sheet" or "TTS"), which provided for a $50 million Line of Credit. The number of warrants demanded by the Trusts was based on, and was in the same ratio as the warrant coverage

contained in the ITS. The Trusts' Term Sheet also provided that the Board of Directors would increase from seven directors to eleven, and that Creel's compensation matters would be subject to review and approval by the Trusts.

According to ITV, Creel and the Trusts had begun strategizing an exclusive financing agreement months earlier. In support of this fact, Plaintiff submits a worksheet from a Microsoft Excel workbook entitled, "Term Sheet Analysis," dated June 14, 2006. Pl. Ex. 31 (analysis of the impact on stock ownership if the Trusts received 51% of outstanding Series A stock). Additionally, it submits an affidavit from a computer science and data forensics analysis that concludes that four documents, including Plaintiff's Exhibit 31, were created as early as April 20, 2006. Pl. Ex. 106. The Defendants submit contradicting evidence in the form of a sworn declaration by Ken Garcia ("Garcia"), CFO of Ecovation, stating that the document was not created until after the Company received the Trusts' Term Sheet on June 22, 2006. Garcia Decl. ¶¶ 30-31. Defendants further maintain that the specific contents of Plaintiff's Exhibit 31 were input on June 27, 2006. The spreadsheet indicates that the Trusts requested the same ratio of warrants for Series A Preferred Stock to debt that the other

Institutional Investors requested in their June 14, 2006 term sheet. Def. Exs. 34 & 37.

According to Becker, the Trusts, through Creel, had threatened to foreclose on the Line of Credit and accelerate the outstanding debt if the Board did not accept their proposal. Pl. Ex. 3 (Becker Dep.) at 56-57. Likewise, Wilson testified that the Board "had a few days until the lender was to foreclose . . . . I mean, there was no alternative. There was no other option than accept the term sheet." Pl. Ex. 16 (Wilson Dep.) at 316-17. Becker and Wilson also testified that Creel threatened to quit the Company if the Trusts' term sheet was not accepted, and the Trusts threatened to foreclose if Creel quit.  Becker Dep. at 103-04; Wilson Dep. at 320. The other four directors, including Early, all executed sworn declarations that uniformly state that no threats of foreclosure were ever communicated. Call Decl. ¶¶ 16-18; Early Decl. ¶¶ 17-19; Patchen Decl. ¶¶ 15-17; Slocum Decl. ¶¶ 18-19.

The Investor Term Sheet was then withdrawn on June 23, 2006. Board member David Patchen testified that "the [investor] term sheet had been withdrawn so the Company had no other alternative." Pl. Ex. 12 (Patchen Dep.) 229-30. According to Paul DiBella of ITV, "[o]ur support in withdrawing that  - - we were not at a point in time to be playing chicken . . .

. We were under the threat of foreclosure, and I certainly understand what it means to take a zero, and that's what we were being faced with." Pl. Ex. 6 (DiBella Dep.) at 191-93. An emergency conference of the Board was held on June 24, 2006, to vote on the TTS. With only one proposal on the table, Ecovation's Board ultimately voted to accept the Trusts' Term Sheet.

### IV.    Outside Financing

After the Company executed the Waiver Agreement, Michael DeRosa ("DeRosa") of Element Partners ("Element"), a venture capital fund, contacted Creel in June, 2006, expressing interest in leading and organizing a round of financing. DeRosa had previously been affiliated with ITV and was involved with ITV's investment in Ecovation, serving as an observer to the Board of Directors. At that time he did not make a formal offer of financing to Ecovation, nor was a term sheet prepared by Element Partners. DeRosa testified, however, that Element was willing to prepare a term sheet and prepared to move quickly. Pl. Ex. 17 ¶ 16; Pl. Ex. 20. Without any feedback from Creel, DeRosa believed the Company "just kind of went cold on us." Def. Ex. 5 (DeRosa Dep.) at 173-75.

On June 18, 2006, Wilson inquired about the status of the ITS and reminded Creel about DeRosa's proposal.

Some weeks later, Creel ended up speaking with DeRosa regarding Element's proposal. On June 20 or 23, Ecovation CFO Ken Garcia sent DeRosa a non-disclosure agreement that DeRosa returned on June 23, 2006, after the Investor Term Sheet had already been withdrawn.

### V.        Creel's Compensation; Second Amended Line of Credit

After the Board approved the TTS, the Trusts agreed not to foreclose on the line of credit on June 30, 2006, while a formal loan agreement was developed in July. At the same time, Creel was negotiating an amended employment agreement and a formal employee retention plan with the Compensation Committee that would guarantee her a multi-million dollar payout at the sale of the Company. Creel shared information relating to these negotiations with the Trusts' representatives.

In a memorandum dated July 14, 2006, the Compensation Committee recommended that the Board approve certain compensation actions with regard to Creel, Garcia, and other Ecovation employees, and generally reflected the agreement reached between Creel and the Compensation Committee. The memorandum was submitted on Ecovation's letterhead. According to Wilson, he "didn't consider it to be in the best interest of all the shareholders." Wilson Dep. 525. Nonetheless, he voted to submit the agreement to the Board for approval because "[t]his

was the best we could do to satisfy her so that this financial arrangement could close." *Id.* at 524.  The Board approved the amended employment agreement, which was executed on July 24, 2006. On the same date that the Company entered into the amended employment agreement with Creel, Ecovation also entered into the Second Amendment to the Line of Credit[3] with the Trusts.

The Trusts requested that Rick Kollauf ("Kollauf"), their personal financial advisor, take one of the four new positions on the Board and permitted Creel to fill the other three positions. While the Amended Line of Credit Agreement made clear that any matters relating to Creel's compensation had to be approved by independent directors and subject to review and approval by the Board, the Trusts now had four additional designees on the Board in addition to Creel and Early.

Soon after the Company executed the amended employment agreement and Amended Line of Credit, Wilson resigned from the Compensation Committee, stating "because the credit agreement contains a covenant that gives lender approval authority for all issues regarding employee incentive pay and retention compensation and more specifically all compensation matters related to you, the committee no longer has

---

[3] The Second Amendment to the Line of Credit contained the principal terms in the Trusts' Term Sheet, including the ability to designate four representatives to the Board of Directors.

relevance." Pl. Ex. 58. He goes on to state that "[g]etting the Company funded was in the best interest of all the shareholders and the compensation committee did what was necessary to facilitate closure of the transaction." *Id.* Following Wilson's resignation, and, with Board approval, the Compensation Committee was restructured and Kollauf became Chair on August 25, 2006.

In 2007, Ecovation hired an independent consultant, Frederic W. Cook & Co. ("Cook"), to make recommendations to the Board regarding an employee retention and compensation plan that had been proposed by management. Pl. Ex. 121. A draft of the Cook report recommended a change to the portion of Creel's employment agreement relating to a severance payment upon a change of control of the Company that would have also deprived her of certain vested contractual rights that she had obtained previously through a Board vote. As a result, Creel contacted Kollauf, now head of the Compensation Committee, to ask Cook to remove that recommendation from its report as outside of the report's scope.

After reviewing the proposed draft, Creel contacted Cook by e-mail on January 30, 2007:

> Right now I am entitled contracturally [sic] to the severance and one third of the IRP. I have extended my tenure contractually to the Company through a sale in exchange for these issues in my contract.  This was done as a favor to the [Trusts], otherwise

we wouldn't have a funded functional company. If I have to work two years for a buyer to get IRP or severance, we can void the contract I signed agreeing to stay and I will go now. When I do go, the Company is obligated to pay back the debt, which it cannot do and basically would be bankrupt if I did leave.

Bottom, bottom line, I am not giving up severance and the Company can't let me because voiding my contract creates a falling house of cards.

Pl. Ex. 122.

Cook removed the recommendation from its report before it was finalized and presented to the Compensation committee. Def. Ex. 346.

### VI.     IDFA Conference and Sale of Ecovation

Following the execution of the Second Amendment to the Line of Credit and the resulting shift in Board control, Becker asked Frautschi whether the Trusts would consider purchasing all of Sterling's shares in September, 2006. The Trusts declined.

Several months later, Creel and another Ecovation executive, Daniel Hagen ("Hagen"), attended an industry conference presented by the International Dairy Food Association ("IDFA") in Orlando, Florida from January 15-17, 2007. There, Creel and Hagen briefly met with representatives from Ecolab, a company that had been identified by J.P. Morgan as a potential purchaser in the previous sale attempt in May of

2006, and a "joint marketing alliance" was discussed. Creel Dep. at 1020-21; Hagen Aff. ¶ 3.

On January 18, Creel flew from Florida to Madison, Wisconsin, to meet with the Trusts. Shortly thereafter, Frautschi contacted Becker with an offer to purchase all of Sterling's stock, which Becker accepted. Frautschi also came in contact with Wilson, who agreed to sell Fratuschi two-thirds of ITV's stock. No written stock purchase agreement, representations, or warranties were made, and the sale concluded quickly on January 30, 2007.

Six months later, Creel advised the Board that Ecovation may receive a preemptive offer for the Company. According to Creel, there was no discussion with Ecolab about a potential acquisition until a meeting in Minneapolis on May 15, 2007. Creel Dep. at 1020.

Ecolab ultimately purchased Ecovation for $210 million on February 5, 2008.

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice 56.11[1] [a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)), *cert. denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Id.* at 249. "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir. 1996). Summary judgment is appropriate only

where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the nonmoving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed.R.Civ.P. 56(c)(1). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## II.   Pending Motions

Plaintiff alleges ten counts against the various Defendants in its Second Amended Complaint. Dkt. No. 116. For the sake of clarity, the issues contained in Defendants' Motions for Summary Judgment shall be grouped together and decided based upon the similarity of the claims: (1) breach of fiduciary duty and aiding and abetting; (2) lender liability; (3) unjust enrichment; (4) tortious interference; and (5) fraud and civil conspiracy.

### A. Breach of Fiduciary Duty

Plaintiff claims, in Count I, that Creel and Frautschi breached their fiduciary duties to the Board and shareholders when: (1) Creel recommended to the Board that the Company accept the Waiver Extension and the Trusts' Term Sheet; (2) Creel intentionally delayed action with

respect to the Investor Term Sheet, which would have saved the Company from foreclosure and prevented the Trusts from diluting the value of the Institutional Investors' shares; (3) Creel failed to renegotiate the terms of the Waiver Extension and Trusts' Term Sheet, with the Trusts at arms-length; and (4) when Frautschi worked with Creel to induce the Board to accept the Waiver extension under unfavorable terms, while he was a member of the Board. 2nd Am. Compl., ¶¶ 136-37. ITV further alleges, in Count II, that the Trusts, as control shareholders, breached their fiduciary duties by colluding with Creel to compel the Board to accept the Waiver Extension and TTS under the threat of foreclosure and agreeing to set Creel's compensation package in exchange for her assistance in securing acceptance of the Waiver Extension and TTS. 2nd Am. Compl., ¶¶ 143-44.

### 1. Breach of Fiduciary Duty Claims

The parties agree that Delaware law applies to the breach-of-fiduciary-duty and related aiding and abetting counts.[4] *See* Creel Mem. 16, Fratuschi Mem. 11, Trusts' Mem. 11, *e.g.*, ITV Mem. 40; see generally,

The elements of breach of fiduciary duty claim under Delaware law are: "(1) that the fiduciary duty exists and (2) that the fiduciary breached that duty." *In re Tropicana Entm't, LLC*, 520 B.R. 455, 470 (Bankr. D. Del.

[4] The parties do not specifically address choice of law with regard to the remaining Counts; however, both sets of briefings are in agreement in applying New York law to Counts III through X.

2014) (citing *York Lingings v. Roach, No. 16622–NC*, 1999 WL 608850, \*2 (Del. Ch. July 28, 1999)). "For a fiduciary duty to exist, there must first be a fiduciary relationship." *Id.* Under Delaware law, a director is a fiduciary of a corporation. *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del. 1993). It is undisputed that Creel and Frautschi owed fiduciary duties to Ecovation.

With regard to shareholder liability, a controlling shareholder owes fiduciary duties to other shareholders. *In re Primedia, Inc. Derivative Litig.*, 910 A.2d 248, 257 (Del. Ch. 2007) (citing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994)).   A controlling shareholder exists when the shareholder: "(1) owns more than 50% of the voting power of a corporation; or (2) exercises control over the business and affairs of the corporation." *Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007) (internal quotation omitted), *aff'd*, 951 A.2d 727 (Del. 2008). Bare allegations that the subject shareholder possesses the "potential ability to exercise control" are insufficient. *Primedia*, 910 A.2d at 257. And, although a plaintiff need not demonstrate that the subject shareholder "oversaw the day-to-day operations" of the corporation, "[a]llegations of control over the particular transaction at issue are enough." *Id.* ITV has submitted evidence that the Trusts had influence over Creel, and that Creel and the Trusts

were sharing information and/or collaborating such that the Trusts' gained control over the business affairs of Ecovation, or, at the very least, control over the June, 2006, financing process. Moreover, factual issues exist as to whether the Trusts' involvement with Company caused it to enter into the challenged transactions.

With regard to ITV's breach of fiduciary duty claims, the following issues of fact preclude summary judgment in favor of Defendants: (1) whether Creel intentionally delayed the financing process in order to obtain Board approval of the Trusts' Term Sheet; (2) whether the Trusts threatened to foreclose on the Line of Credit in order to gain approval by the Board of the TTS; (3) whether Creel failed to pursue financing sources as alternatives to the Trusts' LOC per the Board's direction; (4) whether Creel withheld information from the Board regarding outside investors, specifically, DeRosa and Element Partners; (5) whether Frautschi and the Trusts concealed from the Board their intentions with respect to foreclosure on the LOC and their involvement in future capital raises for the Company; and (6) whether Frautschi and the Trusts promised Creel that they would improve her compensation if she assisted the Trusts in getting their financing proposals approved.

Defendants' motions for summary judgment dismissing Counts I and II of the Second Amended Complaint are denied.

## 2. Aiding/Abetting

ITV also brings claims against Frautschi and the Trusts for aiding and abetting Creel's breaches of her fiduciary duties. Specifically, ITV claims that Frautschi and the Trusts had actual knowledge that Creel breached her duty to the Institutional Investors, and provided substantial assistance in doing so. 2nd Am. Compl., ¶¶ 157-59.

Under Delaware law, to recover on a claim for aiding and abetting another's breach of fiduciary duty, a plaintiff must prove four elements: "(I) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by the non-fiduciary defendants, and (iv) damages proximately caused by the breach." *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 80 (Del. Ch. 2014) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).

The Trusts and Frautschi move for summary judgment dismissing ITV's claim on the grounds that there is no evidence that Creel breached a fiduciary duty and that the remaining Defendants did not knowingly participate in any breach committed by Creel. Trusts' Br. 35-36; Frautschi Br. 12-16. These arguments must be rejected, as ITV has submitted

evidence establishing some collusive efforts between the Defendants, discussed <u>supra</u> in Section II (A)(1), creating material issues of fact with regard to the level of participation the Trusts and Frautschi had in their dealings with Creel and, in turn, the Board. *See, e.g.*, *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172 (Del. 2002) (holding that aiding and abetting a breach of fiduciary duty requires a showing of an underlying breach in the fiduciary duty). For the same reasons, Defendants have failed to prove the non-existence of an issue of fact as to Frautschi's or the Trusts' knowledge of the alleged breach.

Because Defendants' motions for dismissal of the underlying breach of fiduciary duty claims have already been denied, the Court must also deny their motions on the aiding and abetting claims.

As a result, Defendants' motions for summary judgment dismissing Count IV of the Second Amended Complaint is denied.

### B. Lender Liability

Plaintiff contends that the Trusts, as lenders to the Company, owed a fiduciary duty to the other shareholders, including ITV, and breached that duty by abusing their control over the Company to dilute the investments of ITV and the other Institutional Investors.  2nd Am. Compl., ¶¶ 149-54.

The elements of such a claim for lender liability are set forth in the case of *In re KDI Holdings, Inc.*, 277 B.R. 493 (Bankr. S.D.N.Y. 1999). As stated therein:

> Lender liability is established by application of the instrumentality doctrine, which requires: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and (2) Such control must have been used by the defendant to commit fraud or worse, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

277 B.R. at 515-16 (quotation and citations omitted).

To establish lender liability through the use of the instrumentality doctrine in the context of a creditor-debtor relationship, "courts require a strong showing that the creditor assumed actual, participatory and total control of the debtor. Merely taking an active part in the management of the debtor corporation does not automatically constitute control...." *Krivo Indust. Supply Co. v. Nat'l Distillers and Chem. Corp.,* 483 F.2d 1098, 1105 (5th Cir. 1973), *reh'g denied*, 490 F.2d 916 (5th Cir. 1974). *See also Nat'l Westminster Bank USA v. Century Healthcare Corp.*, 885 F.Supp. 601, 603 (S.D.N.Y. 1995).

> [L]ender liability is predicated on an unmistakable showing that
> the subservient corporation in reality has no separate,
> independent existence of its own and was being used to further
> the purposes of the dominant corporation. Suggestions by a
> major lender for a defaulted debtor, even when coupled with a
> threat of the exercise of its legal rights if the debtor does not
> comply, are both commonplace and completely proper.

*Westminster*, 885 F. Supp. at 603.

Because there is a genuine issue of fact as to whether the Trusts colluded with Creel to gain control over Ecovation's business affairs, generally and, with respect to the June 2006 transaction, whether the Trusts leveraged the threat of foreclosure to leave the Board without a viable alternative, Defendants' motion for summary judgment dismissing Count III alleging lender liability is denied.

### C. Tortious Interference

In Counts VI and VII, ITV alleges that ITV developed a business relationship with Ecovation of which the Trusts and Creel had knowledge, and interfered with that relationship when they delayed acting upon, and then ultimately rejected the Investor Term Sheet.  2nd Am. Compl., ¶¶ 169-74. As a result, ITV was unable to make further investments in the Company, and the Board's acceptance of the Trusts' Term Sheet severely diluted the value of the shares owned by ITV. *Id*., ¶ 175.  Plaintiff advances similar claims with regard to Defendants' alleged interference with its rights

under the Amended Certificate of Incorporation, which provided certain rights of first refusal. *Id.*, ¶ 179-183.

Under New York law, the elements of a claim for tortious interference with prospective business relations are (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship. *Nadel v. Play–By–Play Toys & Novelties*, 208 F.3d 368, 382 (2d Cir. 2000).

Defendants move for summary judgment dismissing ITV's tortious interference claims because: (1) the Trusts and Creel were not strangers to the business relationships at issue; (2) ITV failed to adduce evidence of wrongful means; and (3) ITV failed to adduce evidence that the Trusts interfered with ITV's rights under an Amended Certificate of Incorporation.

Generally, "a claim for tortious interference will lie only against a stranger who improperly interferes with a contract between two contracting parties." *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp.2d 395, 407 (S.D.N.Y. 2009). For a successful tortious interference with contract claim, defendant must be a third party in relation to the contract, "that is, he or she may not be a party to the contract at issue."

*In re MF Global Holdings*, No. 11 Civ. 7866(VM) 2014 WL 667481, at *20 (S.D.N.Y. Feb. 11, 2014); *see also Roselink Investors, L.L.C. v. Shenkman*, 386 F.Supp.2d 209, 228 (S.D.N.Y. 2004) (citing *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996)). It is clear that the claim "'must be based on a <u>non-party</u> improperly interfering with a contract between two contracting parties,' and cannot be based on the actions of a director or officer in his official capacity." *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers*, 894 F.Supp.2d 288, 336–37 (S.D.N.Y. 2012) (quoting *Scuderi v. Springer*, No. 03 Civ. 2098 (RO), 2004 WL 2711048, at *2 (S.D.N.Y. Nov. 29, 2004) (emphasis in original)). "A corporate officer or director, when acting within the scope of his or her authority, 'is not a third party vis-a-vis the corporation and as such cannot interfere with [the corporation's] own contract.'" *Conocophillips v. 261 East Merrick Rd. Corp.*, 428 F.Supp.2d 111, 122 (E.D.N.Y. 2006) (quoting *Roselink Investors*, 386 F.Supp.2d at 228); *see also Murtha v. Yonkers Child Care Ass'n, Inc.*, 45 N.Y.2d 913, 914 (1978) (stating that a "director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken"). Thus, "[a] corporate

officer or director generally cannot be liable for tortiously interfering with a contract between the corporation and a third party." *Roselink Investors*, 386 F. Supp.2d at 228 (internal quotation omitted).

Despite this general rule, "a narrow exception exists for officers acting wholly outside the scope of their authority for purely personal gain." *IMG Fragrance*, 679 F.Supp.2d at 407–08 (citing *Scuderi*, 2004 WL 2711048, at *2 (additional citations omitted)). To hold corporate officers personally liable, "plaintiff must establish (1) that defendants' acts were taken outside the scope of their employment; or (2) that defendants personally profited from their acts." *G.D. Searle & Co. v. Medicore Commc'ns, Inc.*, 843 F. Supp. 895, 911 (S.D.N.Y. 1994) (citations omitted).

With respect to Creel, ITV has submitted evidence that she acted for her own personal gain to secure a larger compensation package. Summary judgment is therefore denied with regard to claims made against Creel in Counts VI and VII.

The claims against the Trusts, however, for alleged tortious interference with business relationships must fail as a matter of law insofar as the evidence shows that Trusts were required parties to both the Investor Term Sheet and the Amended Certificate. No reasonable fact-finder could conclude that the Trusts were outsiders or third parties for

purposes of ITV's tortious interference with contract claims. *Koret, Inc. v Christian Dior, S.A.*, 161 A.D.2d 156, 554 N.Y.S.2d 867 (1st Dept. 1990) (corporate parent had a right to interfere with the contract of its subsidiary in order to protect its economic interests); *Kassover v. Prism Venture Partners*, LLC, 53 A.D.3d 444 (1st Dept. 2008) (no tortious interference with contract claim where plaintiffs were express third-party beneficiaries under a merger agreement with right to enforce its terms); *see generally*, *Winicki v City of Olean*, 203 A.D.2d 893, 611 N.Y.S.2d 379 (4th Dept. 1994) ("Plaintiffs cannot state a claim for tortious interference against one of the contracting parties.")   Counts VI and VII as they relate to the Trusts are therefore dismissed.

### D. Unjust Enrichment

ITV claims that under the circumstances alleged above, the Trusts were unjustly enriched when they obtained valuable shares and liquidation preferences in the Company for an unreasonably low price and that the shares owned by ITV in Ecovation were diluted as a result. 2nd Am. Compl., ¶¶ 164-65.

To prevail on a claim of unjust enrichment, "a party must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain

what is sought to be recovered." *Green v. Beer*, 06 Civ. 4156, 2007 WL 576089 at *2 (S.D.N.Y. Feb. 22, 2007) (internal quotations and citations omitted*); see also Cruz v. McAneney*, 31 A.D.3d 54, 59  (2d Dept. 2006).

The Trusts argue that ITV's unjust enrichment claim cannot proceed because it is duplicative of ITV's tort claims. Trusts' Mem. 35. Plaintiff has made clear that its unjust enrichment claim was pled in the alternative. ITV Mem. 78.  Moreover, triable issues of fact exist as to each element of ITV's unjust enrichment claim. Among other things, Plaintiff has presented evidence that the Trusts received millions of warrants to purchase enough stock to own a majority of the outstanding Series A Preferred Stock in Ecovation for $0.01 per share; that ITV and the Institutional Investors withdrew their term sheet and thus did not participate in the June 2006 financing; and that the Trusts' Term Sheet was the only term sheet available for the Board to review, which provided the Trusts with the exclusive right to purchase the penny Series A stock. Dismissal of ITV's unjust enrichment claim is therefore denied.

### E. Fraud and Civil Conspiracy

Counts VIII through X advance claims of securities fraud, common law fraud, and civil conspiracy arising out of the Defendants' alleged concealment of the existence of discussions between Ecovation and

Ecolab at the IDFA Conference in January 2007, before the Trusts' purchase of ITV's stock the very same month. 2nd Am. Compl., ¶¶ 188-197, 202-206, 211-213.

Common law fraud in New York requires: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which plaintiff reasonably relied; and (5) which caused injury to plaintiff." *In re Optimal U.S. Litigation*, 813 F.Supp.2d 351, 381 (S.D.N.Y. 2011). "The elements of fraud under New York law are essentially the same as those for a claim of securities fraud under Section 10(b) and Rule 10b–5." *Serova v. Teplen*, No. 05 Civ. 6748(HB), 2006 WL 349624, at *8 (S.D.N.Y. Feb. 16, 2006).[5]

Plaintiff has adduced evidence that Ecolab may have been identified as a potential buyer in January 2007, if not earlier, and that a discussion of either a joint marketing venture or an acquisition or both took place at the

---

[5]      In the securities fraud context, materiality is a mixed question of both law and fact. *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999), and the Supreme Court has cautioned that "[t]he determination [of materiality] requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly one for the trier of fact." *TSC Indus. v. Northway*, 426 U.S. 438, 450 (1976); *accord RMED Int'l v. Sloan's Supermarkets.*, 185 F.Supp.2d 389 400 (S.D.N.Y. 2002) ("[S]ummary judgment is only appropriate in a 10b–5 action on the grounds of immateriality where the alleged misstatements or omissions are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.") (citations and internal quotation marks omitted).

IDFA Conference between representatives of Ecolab and Ecovation. It is undisputed that Creel then flew to Wisconsin to meet with the Trusts the day following the IDFA Conference. The existence of such merger negotiations could lead a reasonable juror to conclude that the Trusts became motivated to purchase ITV's stock, after previously refusing, upon their learning of a potential sale. Likewise, a reasonable juror could conclude from the record evidence that ITV reasonably relied on Creel's representations to the Board regarding the status of the sale process and on Frautschi's alleged statement concerning the Trusts' long-term exit horizon in determining whether to sell its stock.

In sum, genuine issues of material fact exist as to whether Ecolab and Ecovation started merger discussions at the IDFA Conference; whether those discussions were withheld from ITV and the Board; and whether those discussions influenced Frautschi's decision to purchase stock from Sterling and ITV. Accordingly, I deny Defendants' motions for summary judgment with respect to Counts VIII and IX of the Plaintiff's Complaint.

Finally, Plaintiff brings a conspiracy claim against Defendants, who seek summary judgment on the basis that the law does not recognize a

stand-alone cause of action for civil conspiracy. *See* Creel Mem. 37, Frautschi Mem. 40, Trusts' Mem. 35; 2nd Am. Compl., ¶¶ 211-15.

It is true that "New York does not recognize an independent tort of conspiracy" and liability can only be available based on the establishment of "an independent underlying tort." *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*, No. 10–CV–3789, 2012 WL 3537009, at *17 (E.D.N.Y. Aug. 14, 2012) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 (2d Cir. 2006)). Here, however, Plaintiff's civil conspiracy claims are derivative of its underlying claims for fraud, which survive summary judgment. In this regard, Defendants' motion is denied as to Count X of the Second Amended Complaint.

### III. Summary

The proof, although heavily circumstantial, gives rise to the following issues of fact: whether Creel was providing the Trusts with material information while withholding the same from the Board; whether the Board was improperly influenced by the Trusts, through Creel, in voting on the financing and other agreements; whether the Trusts had Creel threaten the board with foreclosure in order to gain approval of their term sheet; and whether Creel actively sought alternative financing and/or a buyer for Ecovation. These issues of fact pervade nearly every claim advanced by

ITV, except where specifically stated in the above analysis, rendering summary judgment wholly inappropriate. *See Trident Intern. Ltd. v. Am. Steamship Owners Mut. Protection*, No. 05 Civ. 3947, 2008 WL 2909389, at *4 (S.D.N.Y. July 24, 2008) ("Based upon a review of the parties' arguments, their respective (and voluminous) 56.1 statements, and the competing affidavits issued in support of these cross-motions, it is apparent to the Court that summary judgment is wholly inappropriate in this case. Significant and genuine issues of material fact permeate every aspect of this dispute."); *see also, generally* 11 Moore's Federal Practice, § 56.41 [3][d] (Matthew Bender 3d ed.) ("The trial court has the right to exercise its discretion to deny a motion for summary judgment, even if it determines that a party is entitled to it, if, in the court's opinion, the case would benefit from a full hearing.")  I find that to be the case here. The record, containing hundreds of exhibits spanning thousands pages (a good percentage of which was filed under seal), is replete with signs of collusiveness between Creel and the Trusts. The Defendants are alleged to have created a tortious path leading to multi-million dollar benefit for only a select number of stockholders in Ecovation, based upon, among other things, a failure of fiduciary responsibility. In this regard, Plaintiff ITV has raised sufficient issues of material fact to warrant a trial.

## CONCLUSION

The Trusts' motion for summary judgment, Dkt. No. 136, is granted as to Counts VI and VII of the Second Amended Complaint, and denied as to the remaining causes of action. The motions for summary judgment by Defendants Creel, Dkt. No. 134, and Frautschi, Dkt. No. 138, are denied in their entirety as there exists genuine issues of material fact to be determined at trial. Accordingly, the following Counts remain pending:

**As to the Trusts**, Counts II (Breach of Fiduciary Duty), III (Lender Liability), IV (Aiding and Abetting), V (Unjust Enrichment), VIII (Securities Fraud), IX (Common Law Fraud), and X (Civil Conspiracy);

**As to Creel**, Counts I (Breach of Fiduciary Duty), VI and VII (Tortious Interference), VIII (Securities Fraud), IX (Common Law Fraud), and X (Civil Conspiracy); and

**As to Frautschi**, Counts I (Breach of Fiduciary Duty), IV (Aiding and Abetting), VIII (Securities Fraud),  XI (Common Law Fraud), and X (Civil Conspiracy).

ALL OF THE ABOVE IS SO ORDERED.

S/Michael A. Telesca

_____
MICHAEL A. TELESCA
United States District Judge

Dated:      Rochester, New York
            April 28, 2015